Road Materials, Inc. v. Commissioner.
Road Materials, Inc. v. Commissioner
Docket No. 6729-65.
United States Tax Court
T.C. Memo 1967-187; 1967 Tax Ct. Memo LEXIS 74; 26 T.C.M. (CCH) 922; T.C.M. (RIA) 67187; September 26, 1967
LeRoy Katz, Ritz Bldg., Bluefield, W. Va., for the petitioner. John J. Larkin, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's federal income taxes for fiscal years ended November 30, 1958 through November 30, 1963, in the total amount of $399,029.69. By reason of petitioner's concessions with regard to certain minor matters involved in respondent's determination of deficiencies the *76 issues now before us for adjudication have been reduced and the parties have stipulated that: The only proposed assessments left in issue for the fiscal years 1958 to 1963, inclusive are as follows: a. Assessment by the Respondent of accumulated earnings tax for the fiscal years 1958 to 1963, inclusive. b. Disallowance by the Respondent of the claimed deduction for bad debts in the fiscal year ending November 30, 1963, in the amount of Four Hundred Ninety Seven Thousand Two Hundred Sixty Five and 83/100 Dollars ($497,265.83). c. Disallowance by the Respondent of the net loss carryback to the taxable year ending November 30, 1960, in the amount of Fifty Three Thousand Four Hundred Three and 92/100 Dollars ($53,403.92); November 30, 1961, in the amount of Three Hundred Fifty Four Thousand Eighty Eight and 53/100 Dollars ($354,088.53); and November 30, 1962, in the amount of Thirteen Thousand Five Hundred Nine and 81/100 Dollars ($13,509.81). Findings of Fact The parties have stipulated certain of the facts herein. This stipulation and the exhibits identified therein are incorporated in these findings by this reference. Petitioner was organized under the laws of the State *77 of West Virginia on March 17, 1947, with its principal office at Bluefield, West Virginia. The returns for the period here involved were prepared on a fiscal year accrual basis ending November 30 and were filed with the District Director of Internal Revenue at Parkersburg, West Virginia. Petitioner timely filed Form 1139, "Application for Tentative Carryback Adjustment," requesting a refund of tax in the fiscal years ended November 30, 1960, November 30, 1961, and November 30, 1962, as a result of a net loss claimed on the Return for the fiscal year ended November 30, 1963. The original Charter of petitioner provided for a total authorized capital stock of $50,000.00 divided into 500 shares at a par value of $100.00 each. On November 22, 1955, the Charter was amended and the total authorized capital stock of said Corporation was increased to $500,000.00 divided into a total of 5,000 shares at a par value of $100.00 each. The outstanding capital stock of petitioner is and was during the years here involved in the amount of $413,100.00 represented by 4,131 shares with a par value of $100.00 each. These shares were and are owned by the following persons: C. N. Haynes
2,821 shares
Hazel S. Haynes
1,280 shares
A. C. Haynes
30 shares
4,131 shares
*78 The officers of petitioner during the fiscal years 1958 to 1963, inclusive, were: C. N. Haynes
President
A. C. Haynes
Vice-President
H. S. Haynes
Secretary-Treasurer
Hazel S. Haynbes, sometimes referred to as H. S. Haynes, is the wife of C. N. Haynes and A. C. Haynes is the brother of C. N. Haynes. Petitioner is a Corporation engaged in a phase of the road construction business and during the years in issue was engaged in the laying of stone base and asphaltic concrete, commonly described as black-top, on roads and highways. Most of its work was of a type known as resurfacing. The asphaltic concrete used by petitioner in its construction work was made of various grades of rock and sand mixed in asphalt at its plant. The grades of materials used depended on the specifications of the construction contracts. The asphaltic concrete generally used by petitioner in its construction work had to be laid at a temperature of 275 degrees. It was moved from petitioner's asphalt plant, which was stationary, to the various job sites in insulated trucks covered by canvas. Petitioner owned a considerable number of large pieces of equipment including rollers of various *79 weights which were used in the laying of the asphaltic concrete on its surfacing or resurfacing jobs. Because of the nature of the material used by petitioner in its construction work it was unable to undertake construction projects located over approximately 50 miles from its plant. Petitioner was also limited with regard to the period of the year during which it could operate its construction business since a "hot mix" asphaltic concrete such as that used by petitioner can only be laid during warm weather. Ordinarily the period during which petitioner could carry on its construction work was from May 15 to October 15. During the period of the year when petitioner was unable to carry on its construction work it was required to keep its key employees and a number of mechanics on its payroll. These were engaged in the maintenance and repair of its plant and machinery and in the stockpiling of materials to be used in its next season of operation. Petitioner's road construction business, during the periods in issue, required the continuing investment of sums in trucks, an asphalt plant and a large amount of equipment necessary for the operation of its business. At the end of fiscal *80 1958 petitioner's plant and equipment, at cost, totaled $486,511.76 reflecting purchases made during the fiscal years 1948 through 1958. For the fiscal years 1959 through 1963, the cost of petitioner's equipment additions were as follows: 1959
$ 3,634.87
1960
92,631.22
1961
91,485.00
1962
118,338.83
1963
4,860.95
At least 95% of petitioner's work is obtained through competitive bidding on public highway contracts. The governmental bodies awarding the contracts withhold a portion of the contract price (known as "retainage") until final approval of the work, which may take from six months to two years after the work is completed. During the years in issue, petitioner bid on and received contracts for the paving of streets and highways, a large portion of which were in the Cities of Princeton and Bluefield, West Virginia. The West Virginia statute authorizes cities to contract the paving of streets, without liability on the city for the paving costs. Paving certificates, payable over a period of ten years, are issued to the contractor, and his only remedy in the event of non-payment is to sue the abutting property owner. Petitioner, in order to obtain cash, *81 discounted the paving certificates at a local bank, which bank took the certificates as collateral, with recourse. During the years in issue, the governmental bodies awarding contracts to petitioner required the execution of contract bonds guaranteeing to the governmental bodies that petitioner would complete the work according to specifications. In bidding for public highway contracts, petitioner was required to file proposal guaranty bonds, or "bid bonds." Both these types of bonds required an insurance company as surety and required indemnification from the contractor. The insurance companies which acted as sureties required that petitioner have"quick assets" amounting to 10% of the amount of the construction contract. Loans by petitioner to other corporations were considered by the insurance companies as "quick assets." During the periods in issue petitioner needed about $150,000 in "quick assets" for bonding purposes. Haynes Construction Company, Incorporated, a West Virginia Corporation, hereinafter referred to as Haynes, was organized as Acme Concrete and Asphalt Company, a West Virginia Corporation, on January 7, 1950. On October 13, 1956, its Charter was amended and the *82 name changed to Haynes Construction Company, Incorporated, and the principal office moved from Welch, West Virginia to Bluefield, West Virginia. The authorized capital stock of the Corporation at that time was increased from $50,000.00 to $200,000.00 consisting of 2,000 shares with a par value of $100.00 each. During the years 1958 through 1962 1,500 shares were issued and outstanding. In 1963 1,625 shares were issued and outstanding. These shares were owned by the following: 1958
C. N. Haynes, President
895 shares
Hazel S. Haynes, Secretary-Treasurer
5 shares
A. C. Haynes, Vice-President
300 shares
D. W. Jayne
300 shares
1959, 1960, 1961 and 1962
C. N. Haynes, President
895 shares
Hazel S. Haynes, Secretary-Treasurer
5 shares
A. C. Haynes, Vice-President
300 shares
D. W. Jayne
240 shares
J. J. Chase
60 shares
1963
C. N. Haynes, President
1,140 shares
Hazel S. Haynes, Secretary-Treasurer
5 shares
A. C. Haynes, Vice-President
300 shares
J. J. Chase
60 shares
Fred A. Moore
120 shares
Haynes was engaged in the type of road construction business generally characterized as "heavy" construction and during the years in issue was primarily *83 engaged in the grading of roads and highways and the laying of concrete thereon. Occasionally its road construction projects included bridge building and drainage systems. One of its contracts was for the construction of a road bed for a railroad. The contracts for highway construction were bid on a competitive basis. The corporation was qualified to do business in the States of West Virginia, North Carolina, Tennessee, Virginia, and Kentucky. In 1957 Haynes employed Haskell Savage as its general superintendent in charge of all its heavy construction work. This office of general superintendent is of great importance in a construction company such as Haynes. Haskell proved to be so successful in performing the duties of that office and such a valuable employee to Haynes that C. N. Haynes and the other members of this family owning stock in Haynes became concerned over the possibility that he might be lost by Haynes to some other construction corporation unless he were given some ownership in the business which would serve as an incentive to him to continue his connection with Haynes. Because of the size of the capitalization of Haynes and the limited amount of the funds available *84 to Haskell for investment, it was impossible for Haskell to acquire an equity in Haynes large enough to serve as such an incentive to his continued employment. After some discussion between C. N. Haynes and Haskell it was decided that a new corporation should be formed in which Haskell was to have a 35% stock interest. This corporation would work with Haynes on joint ventures consisting of construction jobs in West Virginia while Haynes would carry on construction projects in Tennessee, Virginia and North Carolina for which it had contracts or contemplated the successful bidding on contracts. Accordingly, and for the primary purpose of retaining the services of Haskell to Haynes and otherwise facilitating the operations of Haynes, Savage Construction Company, Inc. (hereinafter referred to as Savage) was incorporated under the laws of the State of West Virginia on March 3, 1960. The total authorized capital stock of Savage was $50,000.00 consisting of 5,000 shares at a par value of $10.00 per share. One thousand shares of the par value of $10,000.00 were issued for cash to the following persons: C. N. Haynes, President
490 shares
Hazel S. Haynes, Secretary-
Treasurer
20 shares
A. C. Haynes, Vice-President
70 shares
J. J. Chase
70 shares
Haskell Savage
350 shares
*85 When Savage was incorporated, C. N. Haynes advanced to it the amount of $10,000.00 which was carried on the books of Savage as a loan. During the years 1960 through 1963 Savage was engaged in the following construction projects as a joint venturer with Haynes: Year
Year Com-
Amount
Began
pleted
Mason County
$ 496,008.00
1960
1963
Wood County
1,223,468.00
1960
1964
Kanawha County
265,167.00
1962
1963
Mason County (No. 2)
84,477.00
1962
1963
Kanawha County(No. 2)
125,400.00
1962
1963
Oak Hill
1,655,335.00
1962
1963-64
Kanawha Malden
1,814,979.00
1962
1963
The contracts for these projects were obtained by the joint ventures on competitive bids and required bid and completion bonds. The projects covered by the contracts were located in parts of West Virginia outside of the territory in which petitioner was capable of operating. Petitioner had no connection with these projects either as a joint venturer or as a sub-contractor. During that part of the years 1961 and 1962 during which construction work could be carried on unusually long and heavy rains fell in West Virginia which made road construction extremely difficult *86 and expensive. During the Summer of 1961 Haskell, who was superintending the work on these projects on behalf of the joint ventures, was seriously ill with a ruptured appendix followed by peritonitis, and during the Summer of 1962 he was ill with gall stones and underwent two operations. As a result of the unusually long and heavy rains, the disabling illnesses of Haskell, and the inconsistent and confusing instructions given during the years in question by newly appointed and inexperienced supervisory personnel in the State Highway Administration, the construction projects in which Savage and Haynes were engaged as joint venturers proved to be unprofitable and resulted in losses to the joint ventures and to Savage. C. N. Haynes, who was the controlling stockholder of petitioner and Haynes and who, with his wife, was the controlling stockholder of Savage, was in charge of the finances of Savage and made arrangements for the advances of funds from petitioner and Haynes to Savage hereinafter described more fully. During the years 1960, 1961, 1962 and 1963, Haynes made certain cash advances and payments to or on behalf of Savage and received certain payments from Savage to or on behalf *87 of itself. In 1960 the net amount of its advances and payments to or on behalf of Savage was $110,891.19. In 1961 the net amount of the payments of Savage to Haynes was $37,898.76, leaving a balance due from Savage according to the books of Haynes of $72,992.43. In 1962 the net amount of the advances and payments made by Haynes to or on behalf of Savage was $143,820.16. In 1963 the net amount of the advances and payments made by Haynes to or on behalf of Savage was $193,804.72. In addition to these 1963 advances and payments by Haynes in the net amount of $193,804.72, Haynes assumed the primary obligation on notes of Savage to Rish Equipment Co. on March 31, 1963, in the amount of $436,164.18, executing its notes to Rish Equipment Co. with Savage nominally obligated thereon as co-signer. This transaction was reflected on Haynes' books by debiting the account of Savage in the amount of $436,164.18. Including this item, the balance due to Haynes from Savage on December 31, 1963, was the sum of $846,781.49. During the period August 31, 1961 through August 31, 1963, C. N. Haynes caused petitioner to advance funds to Savage as follows: Date
Check No.
Amount
Balance
8/31/61
#
$ 40,000.00
9/30/61
#
30,000.00
10/31/61
#
40,000.00
$110,000.00
12/31/61
#1053
15,000.00
125,000.00
3/31/62
#1186
20,000.00
6/30/62
#1353
20,000.00
9/30/62
#1621
70,000.00
10/31/62
#1652
40,000.00
11/30/62
#1717
100,000.00
375,000.00
12/31/62
#1830
10,000.00
385,000.00
1/31/63
#1846
20,000.00
2/28/63
#1871
10,000.00
4/30/63
Payroll journal
1,203.00
4/30/63
Payroll journal
340.00
5/31/63
Payroll journal
533.00
7/31/63
#2154
50,000.00
8/31/63
#2212
30,000.00
8/31/63
Payroll journal
189.83
497,265.83
*88 These advances were shown on petitioner's books as "loans." However, there was no agreement by Savage to repay any of these advances on a date certain or ascertainable date or within a reasonable time, no note or other written evidence of indebtedness was ever given by Savage to petitioner, no interest was payable or paid by Savage thereon, no repayment of any of these advances was ever made to petitioner or demanded by it and no security was ever asked or given for their repayment. At the time these advances were made no outside lender would have made unsecured loans to Savage. At the time of the formation of Savage, C. N. Haynes and the other stockholders of petitioner were aware of the possibility that within a few years construction projects would be advertised for bidding in connection with extensions of Interstate Highway 77 and improvements of U.S. Highway 420, which would involve pavement work within the area surrounding Bluefield, West Virginia, which could be done by petitioner. C. N. Haynes hoped that if and when such construction work was authorized, petitioner might become the successful bidder on contracts for asphaltic paving in connection therewith. He felt that *89 it would be helpful to petitioner in connection with any such possible projects if it could be a joint venturer or sub-contractor with Savage or with Haynes as it had been in connection with two local paving construction projects in 1957. However, this possibility was not a substantial reason for the formation of Savage and did not constitute a substantial reason for the advances made by petitioner to Savage which are here in question. These advances were made because the controlling stockholders of petitioner who were the controlling stockholders of Haynes and Savage considered that they were needed by Savage and would be beneficial to Haynes and not because of any reason, nor to accomplish any business purpose, connected with petitioner. The advances here in question which C. N. Haynes caused petitioner to make to Savage did not in reality constitute loans of petitioner to Savage. During the fiscal year 1958, petitioner's income tax returns for fiscal years 1953 through 1956 were under investigation, and the Internal Revenue Service initially contended that petitioner owed the Government the sum of $136,430.00 in taxes, plus interest. On September 28, 1958, an Internal Revenue *90 Agent forwarded to petitioner a formal and detailed "Preliminary Statement" proposing adjustments in petitioner's income tax liabilities for the fiscal years 1953 through 1956 by way of recommending deficiencies for those years in the total amount of $94,106.66 and total penalties of $4,481.27. On January 24, 1961, respondent determined deficiencies and penalties for those years as follows: Sec. 293(a)
Fiscal Year
Deficiency
Penalty
11/30/53
$13,760.01
$ 688.00
11/30/54
30,335.73
1,516.79 *
11/30/55
26,593.23
1,329.66 *
11/30/56
18,936.72
946.84 *
Petitioner thereafter filed a timely petition with this Court (Docket No. 92040) alleging error with regard to such determination. On April 16, 1963, pursuant to stipulation of the parties, this Court entered its decision in that case deciding that there were no penalties due from petitioner but that there were deficiencies in income tax due from petitioner for the fiscal years ended November 30, 1953, November 30, 1954, November 30, 1955 and November 30, 1956 in the amounts of $7,567.13, $13,976.00, $10,229.50, *91 and $9,227.37, respectively. During the years in issue, petitioner paid salaries to its principal stockholders as follows: For the
C. N.
H. S.
A. C.
Year Ended
Haynes
Haynes
Haynes
Nov. 30, 1958
$18,333.35
$2,200.00
$11,666.66
Nov. 30, 1959
16,666.68
800.00
8,666.65
Nov. 30, 1960
10,000.00
1,100.00
Nov. 30, 1961
16,666.68
1,200.00
13,500.00
Nov. 30, 1962
32,075.55
2,566.66
14,125.00
Nov. 30, 1963
31,875.87
3,466.64
16,133.34 During the years in issue, petitioner's principal stockholder, C. N. Haynes, and his wife, H. S. Haynes, jointly reported net taxable income as follows: C. N. HAYNES & H. S. HAYNES
Net Taxable Income (Calendar Years)
1958
$40,129.31
1959
48,534.61
1960
53,885.93
1961
53,972.50
1962
67,381.35
1963
49,259.64
Petitioner's amended income tax return for the year ended November 30, 1958 reported "Cost of Operation" in the total amount of $154,877.59. The principal items therein were "Salaries, Wages and Commissions" ($36,421.96), "Materials and Supplies" ($32,079.93), "Plant Service Chg." ($11,672.69), "Ins. and Bonds" ($21,353.24) and "Subcontractors" ($35,300.36). The balance *92 sheet in this return showed an increase in the item "Buildings and other fixed depreciable assets" (less depreciation) from $139,963.57 at the beginning of the year to $198,189.25 at the end of the year. This item was largely composed of machinery, equipment and office furniture; the most costly improvement was the asphalt plant. The amended return showed an asset item of $398,163.00 as "Other investments." The original return showed this item in the amount of $265,225.55 of which $129,725.55 was composed of Paving Certificates of the cities of Bluefield and Princeton, West Virginia. The balance sheet attached to the amended return showed an increase in earned surplus from $313,104.84 at the beginning of the year to $430,735.81 at the end of the year. [1] Both returns showed a decrease in the item "Other assets" from $99,419.76 at the beginning of the year to $90,320.44 at the end of the year. Included in this latter figure was [were] "loans and advances" in the amount of $61,636.02. Petitioner's income tax return for the year ended November 30, 1959, reported "Cost of Operation" *93 in the total amount of $163,762.71. The principal items therein were "Salary & Wages" ($24,824.07), "Materials & Supplies" ($64,959.19), "Gas, Oil & Grease" ($15,271.70), "Utilities" ($13,845.57), "Truck Hire" ($27,947.63), and "Ins. & Bonds" ($12,878.69). The balance sheet in this return showed a decrease in the item "Buildings and other fixed depreciable assets" (less depreciation) from $198,189.25 at the beginning of the year to $163,347.84 at the end of the year. The return showed an asset item of $281,949.74 as of the end of the year as "other investments" of which $142,449.74 was composed of Paving Certificates of the cities of Bluefield and Princeton, West Virginia. As of the end of the year the asset item "other assets" appearing in the balance sheet included $61,660.26 as "Loans & Advances" and "earned income and undivided profits" was stated to be $453,100. In an amended return for that year the latter figure was shown as $458,912.69. The income tax return of petitioner for the year ended November 30, 1960, reported "Cost of Operations" in the total amount of $137,289.11. The principal items therein were "Salaries and Wages" ($24,729.16), "Materials: stone, asphalt, etc. *94 " ($69,242.03), "Sub-contracting expense" ($8,775.11), "Truck Hire" ($10,667.54), "Fuel, Power, Water - Plant" ($10,432.07). Among "Other Deductions" claimed was an amount of $1,130.94 as "Contract Bond Expense." The balance sheet in this return showed an increase in the item "Buildings and other fixed depreciable assets" (less depreciation) from $163,347.84 at the beginning of the year to $220,282.24 at the end of the year. The return showed an asset item of $301,995.67 as of the end of the year as "Other Investments" of which $136,668.06 was composed of Paving Certificates of the cities of Bluefield and Princeton, West Virginia. As of the end of the year the asset item "Other Assets" appearing in the balance sheet included $54,153.24 as "Loans and Advances" and "earned surplus and undivided profits" was stated to be $512,879.43. Petitioner's income tax return for the year ended November 30, 1961 reported "Cost of Operations" in the total amount of $574,371.47. The principal items therein were "salaries and wages" ($148,935.39), "Materials: stone, asphalt, etc." ($289,213.86), "Truck Hire" ($28,569.89), "Fuel, Oil and Grease" ($31,998.67), "Fuel, Power, Water" ($27,542.59) and *95 "Equipment Rental" ($30,931.00). Among "Other Deductions" claimed was an amount of $4,442.19 as "Contract Bond Expense." The balance sheet in this return showed an increase in the item "Buildings and other fixed depreciable assets" (less depreciation) from $220,282.24 at the beginning of the year to $260,480.21 at the end of the year. The return showed an asset item of "Other investments" in the amount of $295,902.84 of which $135,054.35 represented Paving Certificates of the cities of Bluefield and Princeton, West Virginia. As of the end of the year the asset item "Other assets" included $34,888.26 as "Loans and Advances," and earned surplus was stated to be $698,236.04. The most significant changes in petitioner's financial condition from the beginning of the year to its end as disclosed by its return and balance sheet were the increase of its accounts receivable from $570,026.48 to $940,620.85, the increase of its accounts payable from $46,727.37 to $84,052.50, the increase of its "other liabilities" from $21,933.10 to $178,626.04, the increase of its cost of operations from $137,289.11 to $574,371.47, and the increase in its earned surplus from $512,879.43 to $698,236.04. During *96 this year petitioner made cash advances to Savage Construction Company, Inc. in the total amount of $110,000. While it is stipulated that these advances were "shown on the books of petitioner as loans," they are included in the "accounts receivable" items in the balance sheets appearing in petitioner's returns. The first of the cash advances from petitioner to Savage in the amount of $40,000 was made on August 31, 1961. As of that date, the account of Savage with Haynes as shown on the books of Haynes indicated a net indebtedness of Savage to Haynes of $163,181.47. Petitioner's income tax return for the year ended November 30, 1962, reported "Cost of Operations" in the total amount of $760,407.84. The principal items therein were "Salaries and Wages" ($224,896.77), "Materials: stone, asphalt" ($326,632.05), "Subcontracting Expense" ($54,976.03), "Truck Hire" ($59,705.67), "Gas, Oil & Grease" ($39,909.32) and "Fuel, Power, Water" ($29,527.17). Among "Other Deductions" claimed was an amount of $7,168.58 as "Contract Bond Expense." The balance sheet in this return showed an increase in the item "Buildings and other fixed depreciable assets" (less depreciation) from $260,480.21 at *97 the beginning of the year to $294,558.76 at the end of the year. The return showed an asset item of "Other Investments" in the amount of $271,987.23 of which $110,369.58 represented "City Paving Certificates." As of the end of the year the asset item "Other Assets" included $33,273.30 as "Loans & Advances" and earned surplus was stated as $845,593.53. The most significant changes in petitioner's financial condition from the beginning of this year to its end were the increase of its accounts receivable from $940,620.85 to $1,154,053.81, the increase of its "Cost of Operations" from $574,371.47 to $760,407.84, a decrease in its "other liabilities" from $178,626.04 to $139,162.78, an increase in its accounts and notes payable from $162,114.92 to $238,381.00, and the increase in its earned surplus from $698,236.04 to $845,593.53. During this year petitioner made additional cash advances to Savage Construction Company, Inc. in the total amount of $265,000.00. These advances, although shown on petitioner's books as "loans" were included in its balance sheet in the asset item "accounts receivable." Petitioner's income tax return for the year ended November 30, 1963, reported "Costs of Operation" *98 in the total amount of $456,441.76. The principal items therein were "Salaries & Wages" ($155,009.10), "Materials: stone & asphalt" ($209,516.37), "Truck Hire" ($15,507.72), "Gas, Oil & Grease" ($24,695.47) and "Fuel, Power & Water" ($18,932.61). Among "Other Deductions" claimed was an amount of $2,526.14 as "Contract Bond Expense." The balance sheet in this return showed a decrease in the item "Buildings and other fixed depreciable assets" (less depreciation) from $294,558.76 at the beginning of the year to $266,952.32 at its end. The return showed an asset item of "Other Investments" in the amount of $312,779.54 of which $121,969.37 represented "City Paving Certificates." As of the end of the year the asset item "Other Assets" included no amount as "Loans & Advances." Its earned surplus as of the end of the year was stated as $370,925.14. During this year petitioner made additional cash advances to Savage Construction Company, Inc. in the total amount of $122,265.83. These advances were reflected in its balance sheet in the asset item "accounts receivable." The last two of these advances were made on August 31, 1963. The total amount of the advances made in the years ended November 30, 1961, 1962 *99 and 1963 ($497,265.83) was charged off as a bad debt at the end of the last year. Petitioner's balance sheet for that year shows a decrease in its asset item "notes and accounts receivable" from $1,154,053.81 at the beginning of the year to $607,394.62 at its end, and a decrease in its "earned surplus and undivided profits" from $845,593.53 to $370,925.14. The balance sheets for the pertinent years showed cash on hand as of November 30, as follows: Year
Amount
1958
$10,511.63
1959
24,902.65
1960
30,964.12
1961
33,874.78
1962
2,354.18
1963
6,889.31
The balance sheets of petitioner for all of these years showed in the asset item "Other Investments" bonds of the City of Bluefield in the amount of $135,000. Petitioner's returns for the pertinent fiscal years reported taxable income as follows: Year ending Nov. 30, 1958
$ 35,170.87
Year ending Nov. 30, 1959
38,010.73
Year ending Nov. 30, 1960
53,403.92
Year ending Nov. 30, 1961
354,088.53
Year ending Nov. 30, 1962
285,424.91
Year ending Nov. 30, 1963
(421,002.26)
In the return for the last fiscal year showing a loss of $421,002.26 petitioner had deducted $497,265.83 on account *100 of the claimed bad debt of Savage here in question. The parties have stipulated that the summary of petitioner's surplus account is as follows: Fiscal
Beginning
Income
Other Credits
Ending
Year
Balance
Profit
Tax
and (Charges)
Balance
11/30/57
$145,244.92
$ 327,281.11
[164,686.18)
$ 5,264.99
$313,104.84
11/30/58
313,104.84
42,718.52
(16,713.63)
3,966.60
11/30/58 *
79,776.25 *
422,852.58
11/30/59
422,852.58
43,469.35
(16,918.73)
7,850.82
457,254.02
11/30/60
80,345.08
(28,000.00)
9,548.89
519,147.99
11/30/61
362,399.96
(175,300.00)
(7,944.66)
698,303.29
11/30/62
150,329.95
(93,000.00)
(533.40)
755,099.84
11/30/63
124,534.59
(54,600.00)
(5,322.90)
819,711.53
Summary
$145,244.92
$1,131,078.56
[549,218.54)
$ 92,606.59
$819,711.53
Bad Debt
($497,265.83)
$322,445.70
Charge Off
Opinion KERN, Judge: The first question presented herein is whether the total of the advances made by petitioner to Savage in 1961, 1962 and 1963 constituted a bona fide debt of Savage to petitioner which became worthless in 1963 and could be deducted by *101 petitioner in that year as a bad debt under section 166(a)(1), I.R.C. 1954. [2]
Respondent contends that the advances did not constitute a bona fide debt of Savage arising from a debtor-creditor relation but were contributions to capital. See Regulations, Section 1.166-1(c). This question is to be determined upon a consideration of a number of criteria none of which is controlling. See Matthiessen v. Commissioner, 194 F. 2d 659, Sam Schnitzer, 13 T.C. 43, aff'd 183 F. 2d 70, 2554-58 Creston Corp., 40 T.C. 932, J. A. Maurer, Inc., 30 T.C. 1273. The following circumstances, which we consider are established by the record, persuade us that the advances in question did not, as a matter of economic reality and therefore for "tax purposes" constitute a bona fide *102 debt of Savage to petitioner: (1) there was no agreement by Savage, in writing or otherwise, to repay any of the advances at a fixed or ascertainable maturity date or within a reasonable time, (2) no interest was payable or paid on such advances, (3) no security was asked or given for the repayment of such advances, (4) no repayment was ever made or demanded of any of such advances, (5) the funds advanced to Savage were placed at the risk of its business in that there was no reasonable expectation of repayment regardless of the success of the venture, and (6) no outside lender of money would have made similar unsecured advances to Savage. Respondent argues that an important factor leading to this conclusion is the disproportionate ratio of the nominal debt of Savage to its acknowledged stock interest. While it seems apparent that in view of the nature of its business Savage was undercapitalized, it is not so apparent in the light of cases cited by petitioner that this undercapitalization was so extreme as to require a conclusion that the nominal debt was in reality risk capital. However, as we said in J. A. Maurer, Inc., supra at 1291, "* * * we merely observe that *103 the ratio of claimed debt to acknowledged risk capital is such that it in no way militates against the validity of our conclusion." One fact which would normally tend to negate a conclusion that the advances did not constitute a bona fide debt is that petitioner itself owned no stock of Savage. We have considered this factor but because the individuals who owned all of the stock of petitioner owned the controlling stock of Haynes for the benefit and advantage of which corporation Savage was organized and operated we are not persuaded by it to a contrary conclusion. The main thrust of petitioner's argument on this question is to the effect that it expected Savage to join with it in bidding and working on construction projects to their mutual advantage, that the advances were made to effectuate this purpose, and that consequently petitioner had a "non-investment" purpose for making the advances which should properly be treated as loans, as designated by the parties to the transaction. Petitioner in this argument relies heavily on Byerlite Corporation v. Williams, 286 F. 2d 285 and American Processing and Sales, Inc. v. United States, 371 F. 2d 842. In *104 both of those cases proof that "* * * the funds were loaned * * * only to promote the business purposes of the * * * lender" ( Byerlite Corporation v. Williams, supra, at 292) was considered persuasive evidence of the "non-investment" character of the advances. In both there were repayments of some of the advances, - in Byerlite by credits for delivered materials and in American Processing and Sales, Inc. as "the product of credits and debits resulting from mutually advantageous trading." In the latter case the court stressed the fact that the debit balance there involved was from "trading activities" and stated that it therefore assumed "a different complexion than had it been solely cash advances, for the latter would be more amenable to construction as capital contributions." In the instant case the debit balance in the account between petitioner and Savage resulted solely from cash advances made by petitioner and no part of such cash advances was ever repaid by Savage in any manner. A more important distinction is that petitioner in this case has failed to prove that the advances were made in order to promote its own business purposes. To the contrary it is our opinion *105 that the record in this case requires a conclusion that the primary and motivating reason for making the advances to Savage was to promote the business interests of Haynes in which the controlling stock interest was held not by petitioner but by individuals who also owned all of the stock of petitioner and whose individual interests were served thereby not as stockholders of petitioner but as stockholders of Haynes, and that any benefit which might be derived by petitioner from such advances was speculative, incidental and unimportant. The two cases relied upon by petitioner might be pertinent to a consideration of the proper characterization of the advances by Haynes to Savage, but in our opinion are not pertinent to the advances to Savage by petitioner. Upon consideration of the entire record herein in the light of the pertinent criteria as above indicated we conclude that the advances of petitioner to Savage were not loans creating a bona fide debtor-creditor relationship and that, therefore, respondent did not err in his determination that a deduction of the total amount of such advances as a bad debt should be disallowed. [3]
*106 In his reply brief, filed some six months after the trial of this case, respondent makes the following statements: After further consideration of the facts involved in this case, respondent now views the substance of the transactions involved herein as follows. Respondent reiterates its position that the advances from petitioner to Savage Construction Co. do not constitute bona fide loans * * *. Since, however, petitioner and Savage Construction Co. are unrelated corporations in the sense that neither owns stock in the other (although they are related corporations by reason of the common ownership and control exercised over each by C.N. and H. S. Haynes), the advances by petitioner to Savage, since they do not constitute bona fide loans, must be considered as constructive dividends to the shareholders of petitioner and an immediate contribution of capital by them to Savage Construction Co. [Citing cases.] Therefore, if the Court should find that the advances by petitioner to Savage Construction Co. are not bona fide loans, respondent submits that petitioner has made constructive dividends to its shareholders which, for purposes of computing the accumulated taxable income *107 of petitioner under section 535 of the Code (including the accumulated earnings credit under section 535(c) of the Code), would have to be taken into account as dividends paid by petitioner and which, having been taken into account, would eliminate much of the liability for the accumulated earnings tax for petitioner's fiscal years ending November 30, 1961 through November 30, 1963. If the Court should so determine, the computation of the dividend received credit for accumulated earnings tax purposes can be computed under Rule 50. * * *
In summary, respondent's position is that petitioner's advances to Savage Construction Co. were not bona fide loans but were constructive dividends to petitioner's shareholders and a contribution of capital by them to Savage Construction Co., and that, accordingly, petitioner is entitled to credit for these dividends paid in computing accumulated taxable income (which credit can be computed under Rule 50). * * *
These statements constitute concessions made by respondent in connection with the issue of whether petitioner was "availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings *108 and profits to accumulate instead of being divided or distributed" within the meaning of Section 532 I.R.C. 1954[4] and the related issue of whether "the earnings and profits of * * * [petitioner were] permitted to accumulate beyond the reasonable needs of the business * * *" within the meaning of Section 533(a) I.R.C.[5]
*109 The logical corollaries of these concessions are (1) that petitioner during the taxable years distributed its earnings and profits in the total amount of $497,265.83 to its stockholders, (2) that petitioner's surplus account increased during the taxable years from $313,104.84 to only $322,445.70 instead of to $819,711.53, [6] and (3) that no part of petitioner's undistributed earnings were invested "in assets having no reasonable connection with the business of the corporation" (see Regulations, Section 1.533-1(a)(2)(ii)). In our opinion the evidence herein establishes the following ultimate facts: (1) the nature of petitioner's business, being seasonal, subject to extraordinary risks of weather and involving unusual delays in the receipt of payments on its construction projects, required the availability of large amounts of working capital, (2) petitioner as a prosperous and growing corporation during most of its taxable years reasonably anticipated the necessity of making large expenditures from its income on improvements and additions to its plant and equipment, and (3) the assertion *110 of claims by the Internal Revenue Service in 1958 and the later determinations of deficiencies by the respondent in 1961 against petitioner in total amounts in excess of $90,000.00, which claims and deficiencies were not settled until the last of the taxable years, and then in the total amount of approximately $40,000.00, would cause petitioner in the exercise of prudence to retain from earnings large amounts as reserves against these potential liabilities. Based upon these ultimate facts and the concessions of respondent together with the logical corollaries thereof, we conclude that the earnings and profits of petitioner were not permitted to accumulate beyond the reasonable needs of its business during the taxable years and that petitioner was not availed of during the taxable years for the purpose of avoiding income tax with regard to its stockholders. Accordingly, on the issue of whether respondent erred in his determination that petitioner was liable for accumulated earnings taxes for the years before us, we decide in favor of petitioners. We point out that we have made no finding and stated no conclusion with regard to a characterization of the advances of petitioner to *111 Savage as dividends distributed by petitioner to its stockholders but have merely accepted respondent's concession on this point together with its logical corollaries. As we have stated above, this concession was made by respondent in a contention advanced long after the trial herein. There was nothing in the pleadings or in the opening statement of counsel for respondent to indicate a contention on the part of respondent that the advances in question constituted constructive dividends distributed by petitioner to its stockholders. Under the circumstances we consider that any finding or conclusion on our part in this case to the effect that in law and in fact such advances constituted distributions of dividends to petitioner's stockholders would be unwarranted and unfair. While respondent's concession is in no way inconsistent with the facts established by the evidence herein, we have limited ourselves to the negative finding and conclusion that these advances, as a matter of economic reality and for tax purposes did not constitute a bona fide debt owed by Savage to petitioner. Decision will be entered under Rule 50. Footnotes
*. Section 6653(a) of the Internal Revenue Code of 1954↩.
1. As set out infra, $79,776.25 of this increase in earned surplus was due to "equipment revaluation."↩
*. Arising from equipment re-valuation.↩
2. SEC. 166(a). General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩
3. Our conclusion with regard to this bad debt issue also disposes of the issue involving the net loss carrybacks.↩
4. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. (b) Exceptions. - The accumulated earnings tax imposed by section 531 shall not apply to - (1) a personal holding company (as defined in section 542), (2) a foreign personal holding company (as defined in section 552), or (3) a corporation exempt from tax under subchapter F (section 501 and following). ↩
5. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532↩, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.
6. In connection with increases in petitioner's surplus account see footnote 1, supra.↩