Road Materials, Inc. v. Commissioner.
Road Materials, Inc. v. Commissioner
Docket No. 6729-65.
United States Tax Court
T.C. Memo 1971-170; 1971 Tax Ct. Memo LEXIS 163; 30 T.C.M. (CCH) 728; T.C.M. (RIA) 71170; July 20, 1971, Filed LeRoy Katz, P. O. Box 1534, Ritz Bldg., Bluefield, W. Va., and Richard L. Hirshberg, for the petitioner. Robert A. Roberts, for the respondent. TIETJENS
Supplemental Memorandum Findings of Fact and Opinion This case is now before this Court on remand from the United States Court of. Appeals for the Fourth Circuit. Our original opinion (See [Dec. 28,614(M)] T.C. Memo. 1967-187, filed September 26, 1967, based on which a decision was entered on December 21, 1967), was vacated by the Court of Appeals *165 in order for us to consider an argument raised by petitioner for the first time before the Court of Appeals and not previously presented to this Court for decision. Road Materials, Inc. v. Commissioner, 407 F. 2d 1121 (C.A. 4, March 5, 1969).[1]
In our original opinion we held that certain advances of petitioner totaling $497,265.83 *166 to Savage Construction Company, Inc. which became completely worthless in 1963, the taxable year at issue, "were not loans creating a bona-fide debtor-creditor relationship and that, therefore, respondent did not err in his determination that a deduction of the total amount of such advances as a bad debt [under section 166(a)(1), I.R.C. 1954] should be disallowed." [2] The Court of Appeals held that our disposition of the issue before us was correct. Furthermore, our original findings of fact were in no way disturbed by the Court of Appeals. In remanding this case to this Court, the Court of Appeals stated: The taxpayer claims in this court for the first time that if the $497,265.83 is not deductible as a bad debt, it should be considered an ordinary loss because the investment was in securities of an affiliated corporation within the meaning of Int. Rev. Code of 1954 sec. 165(g)(3). This issue raises factual and legal questions that should be considered in the *167 first instance by the Tax Court, and to that end we remand. Thus the sole issue which we must decide, as stated by the Court of Appeals and as narrowed by the parties, is whether "at least 95 percent of each class of [Savage Construction Company's] stock [was] owned directly by [petitioner] within the meaning of section 165(g)(3)(A), I.R.C. 1954. [3]
A conference was held with counsel for the parties on October 8, 1969 to consider what further proceedings would be taken. The parties agreed that the issue to be decided herein would be submitted for decision on the record already before this Court with the addition of certain stipulated documents. An additional stipulation was 729 filed, and both parties have filed original and reply briefs directed to the issue presently before this Court. Supplemental Findings of Fact The facts giving rise to this issue are set out in our original opinion, T.C. Memo. 1967-187. There follows a summary of those facts, together with our fresh findings. C. N. Haynes is a president and *168 principal stockholder of two family corporations: Road Materials, Inc., the petitioner, and Haynes Construction Company, hereinafter referred to as "Haynes." Both corporations are engaged in the road construction business. During the years in issue, petitioner was primarily engaged in the laying of stone base and asphaltic concrete, commonly described as black-top, on roads and highways. The asphaltic concrete used by petitioner in its construction work is transported in insulated trucks from its stationary asphalt plant in Bluefield, West Virginia, to various construction sites. Because the asphaltic concrete had to be laid at 275 degrees, the petitioner could not work further than 50 miles from its plant. Haynes was primarily engaged in heavy road construction, which included the grading of roads and laying concrete thereon and which occasionally included bridge building and drainage systems. Haynes was qualified to do business in the States of West Virginia, North Carolina, Tennessee, Virginia, and Kentucky. Haskell Savage was hired by Haynes as its general superintendent in charge of all its heavy construction work in 1957. He proved to be such a valuable employee to Haynes *169 that the Haynes family decided to offer him an opportunity to acquire partial ownership in the family road construction business. Because of the size of the capitalization of Haynes and the limited amount of the funds available to Haskell for investment, it was impossible for Haskell to acquire an equity interest in Haynes large enough to serve as an incentive to his continued employment. To remedy this, on March 3, 1960 the Haynes family and Haskell formed a new corporation, Savage Construction Company, Inc. (hereinafter referred to as Savage), under the laws of West Virginia. It was envisioned that Savage would work with Haynes on joint ventures consisting of construction jobs in West Virginia, while Haynes would carry on construction contracts in Tennessee, Virginia and North Carolina. Savage and Haynes did in fact work jointly on seven projects, all outside the operating range of petitioner. The total authorized capital stock of Savage was $50,000 consisting of 5,000 shares at a par value of $10 per share. The Certificate of Incorporation of Savage did not provide for the issuance of more than one class of stock in that company. [4] One thousand shares of the par value of $10,000 *170 were issued to the following persons, each of whom purchased and held the shares on his or her own behalf and not as agent for or on behalf of any person or entity, including petitioner: [5]
C. N. Haynes, President
490 shares
Hazel S. Haynes, Secretary- Treasurer
20 shares
A. C. Haynes, Vice President
70 shares
J. J. Chase
70 shares
Haskell Savage
350 shares
When Savage was incorporated, C. N. Haynes advanced to it the amount of $10,000 which was carried on the books of Savage as a loan. From August 31, 1961 through August 31, 1963, C. N. Haynes arranged for the petitioner to advance *171 $497,265.83 to Savage without security and without the execution of a note or other written evidence of indebtedness. The advances were shown on the petitioner's books as "loans" and were entered on the books of Savage as items payable to affiliated companies. There was no agreement by Savage to repay any of the advances on a date certain or within a reasonable time. Petitioner made no demand for interest or repayment of principal, and none was paid. During the years 1960 through 1963 Haynes also made certain cash advances and payments to or on behalf of Savage, and received certain payments from 730 Savage to or on behalf of itself. Haynes at no time owed money to Savage. These advances and repayments between Haynes and Savage were treated in the same manner as the advances from petitioner to Savage, i. e., there were no notes or other written evidence of indebtedness and there was no agreement to repay any of the advances on a date certain or within a reasonable time, instead they were merely shown on the books of Haynes and Savage as amounts receivable or amounts payable. Including an item described by petitioner as "Notes and Accounts payable Rish Equipment Co. by Savage *172 consolidated in new notes of Jan. 21, 1963 Haynes to Rish with Savage as Co-Signer" in the amount of $436,164.18, the balance due from Haynes to Savage on December 31, 1963 was the sum of $846,781.49. Advances between petitioner and Haynes, treated in the same manner as the advances described above, had been made during the years 1957 through 1963. On its balance sheet for its fiscal year ended November 30, 1963, petitioner listed a sum of $415,607.79 as being due from Haynes; on Haynes' balance sheet for its fiscal year ended December 31, 1963, Haynes listed a sum of $385,607.79 as being due to petitioner. Ultimate Conclusion At no time during the year 1963 or in prior years did petitioner Road Materials, Inc., directly own, or have a right to subscribe for or to receive, at least 95 percent of each class of stock of Savage. Opinion TIETJENS, Judge: The sole issue presented on this remand is whether petitioner's loss is an ordinary loss as a result of the applicability of section 165(g) (3), rather than a capital loss. Section 165(g), as applicable to this case in pertinent part, reads as follows: *173 SEC. 165(g). Worthless Securities. - (1) General rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. * * * (3) Securities in affiliated corporation. - For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if - (A) at least 95 percent of each class of its stock is owned directly by the taxpayer, and (B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, and gains from sales or exchanges of stocks and securities. We held in our original opinion *174 in this case (T.C. Memo. 1967-187, and the Court of Appeals agreed 407 F. 2d 1121, 1123-1125), that petitioner's advances to Savage did not constitute a debt within the meaning of section 166(a)(1). It is undisputed that Savage had no disqualifying income of the type specified in section 165(g)(3)(B), and that both petitioner and Savage are domestic corporations. It is undisputed that petitioner sustained a loss due to the complete worthlessness of its advances to Savage in 1963 as a result of Savage's insolvency occurring in that year. (The parties also appear to have agrred that the advances from Haynes to Savage are to be treated as a bona fide debt of Savage.)[6] The only question we must decide is whether, on the facts presented, petitioner can be considered to be the direct owner of at least 95 percent of each class of Savage's stock within the meaning of section 165(g)(3)(A).
As we understand petitioner's *175 argument, it begins with the following syllogism. Petitioner's major premise in its syllogism is that it owned "securities" of Savage as that term is defined in section 165(g)(2) (B) in the total amount of its advances to Savage ($497,265.83). Petitioner's minor premise is a proposition to be inferred from an examination of the Certificate of Incorporation of Savage, that Savage was authorized to issue only one class of stock. 731 Petitioner then concludes that the "securities" it owned in Savage were the equivalent of the one class of stock which Savage was authorized to issue. Because, petitioner adds, petitioner's advances of $497,265.83 were the only contributions to Savage's capital apart from the cash payments of $10,000 made by Savage's individual shareholders who purchased 1,000 shares of the capital stock of Savage (and possibly also the additional amount of $10,000 advanced to Savage by C. N. Haynes when Savage was incorporated), petitioner owned more than the necessary minimum of 95 percent of Savage's one class of stock and therefore is entitled to an ordinary loss deduction under section 165(g)(3). In support of its position herein, petitioner relies on Gussow, Kahn & Co., 13 T.C. 580; *176 and on Byerlite Corp. v. Williams, 170 F. Supp. 48 (N.D. Ohio), reversed on another issue, 286 F. 2d 285 (C.A. 6). Respondent's primary position is as follows: pursuant to our finding in our original opinion in this case that the advances from petitioner to Savage were made solely to promote the business of the Haynes family, these advances represented dividends to petitioner's common stockholders and contributions by them to the capital of Savage, and therefore these advances cannot be characterized as petitioner's capital investments in Savage. Respondent also contends that, whether or not this Court accepts his primary position, the advances constitute another class of stock with rights different from the 1,000 shares issued to the original individual stockholders. We do not think it necessary to agree with the position taken by respondent in these arguments in order to decide this case against petitioner. Petitioner relies heavily on Gussow, Kahn & Co., supra. We think the facts there render that case distinguishable from the case before us. In the Gussow, Kahn & Co. case, the taxpayer corporation caused the organization of a subsidiary *177 corporation and advanced to it all of the funds which the subsidiary was to use in its unsuccessful business endeavors. These advances were treated by both the taxpayer and the subsidiary as loans. At no time did the subsidiary issue any of its stock, and no person or corporation other than the taxpayer had any financial interest in the subsidiary. In our opinion in the Gussow, Kahn & Co. case we concluded that the taxpayer in that case "had the legal right to direct the issuance to itself of all of the authorized capital stock of [the subsidiary] and, in legal effect, therefore, [taxpayer] directly owned * * * 100 per cent of [the subsidiary's] stock." (13 T.C. at 584) [Emphasis added.] Accordingly, we held that the subsidiary was an affiliated corporation of the taxpayer within the meaning of the 1939 Code predecessor to section 165(g)(3). [7]
In contrast to the taxpayer in the Gussow, Kahn & Co. case, the petitioner in *178 the instant case has failed to convince us that it ever had the legal right to cause Savage to issue to it any stock of the same class as that owned by Savage's individual shareholders. Under the present facts, we can reach no conclusion other than that petitioner never owned and never had a right to subscribe for, or to receive, any of Savage's common stock. We so hold. See Northeastern Consolidated Co. v. United States, 406 F. 2d 76, 79 (C.A. 7, 1969), where it was said: Under § 165(g)(3)(A), "a corporation shall be treated as affiliated with the taxpayer only if - (A) at least 95 percent of each class of its stock is owned directly by the taxpayer * * *." In the instant case, although taxpayer owned an equity investment in Necco, that investment was not in Necco's common stock. It is undisputed that Donnelly and Schmidt owned 100 percent of that class and thus Necco was not, under the statutory definition, affiliated with taxpayer since taxpayer did not own at least 95 percent of each class. Here, even though we were to decide that petitioner by reason of its advances, held the right to acquire all of the unissued stock of Savage, we note that Savage's authorized *179 stock was 5,000 shares at a par value of $10 per share. One thousand of these shares (20%) had already been issued to others than Savage, so that if we held that petitioner had the right to subscribe to the remaining 4,000 shares and that the remaining shares would be of the same class as those issued to the other original stockholders, petitioner would still fall short of meeting the statutory test applicable to the tax years 732 in question, that "at least 95 percent of each class of its stock is owned directly by the taxpayer, * * *." This is the basis for our decision. Petitioner had an equity investment in Savage but did not directly own "at least 95 percent of each class of stock." We are convinced that within the meaning of section 165(g)(3) petitioner did not own "at least 95 percent of each class of [Savage's] stock." Petitioner does not suggest that the advances from petitioner to Savage entitled petitioner to any right to vote or otherwise to participate in the management of Savage's affairs. Nor does petitioner maintain that petitioner was to participate in the earnings or growth of the business; in fact, it was originally contemplated by Savage's individual stockholders *180 that they, rather than the petitioner corporation, would reap the benefits of Savage if it were a successful enterprise. It was for this reason that petitioner's advances to Savage were characterized as, and intended to be, debt. It appears that petitioner argued before the Court of Appeals that its advances to Savage were in a form which West Virginia law recognizes as debt. 407 F. 2d, at 1124. Petitioner does not now in this Court argue to the contrary. Petitioner urges, citing legislative history of section 23(g)(4), I.R.C. 1939 (predecessor to section 165(g)(3)) not pertinent to the question before us, that section 165 (g)(3) and its predecessor are relief provisions, and a liberal construction of those sections is to be favored by this Court "permitting the allowance as ordinary loss deductions of losses due to the worthlessness of investments in substantially wholly owned subsidiaries." We agree with petitioner that section 165(g)(3) and its predecessor were intended as relief measures, but we disagree with petitioner's statement as to their scope. As we read these sections and their legislative history, we think that the Congressional motive behind their enactment *181 was to provide relief to domestic corporations whose stock in a wholly owned subsidiary became totally worthless under the narrow circumstances where the parent corporation could have filed consolidated returns with the subsidiary, but did not do so. See S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 543; H. Rept. No. 1337, to accompany H.R. 8300 (P.L. 591), 83d Cong., 2d Sess., pp. 21, A47 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (P.L. 591) 83d Cong., 2d Sess., pp. 24, 199 (1954). We have taken into account the fact that the language of sections 165(g)(2) and 165(g)(3) differs from the language of section 1504(a), [8] set forth in the margin, which basically defines "affiliated group" for purposes of filing consolidated returns. Still we find no compelling reason in the language of sections 165(g)(2) and 165(g)(3) or in their legislative history to recast the debt form of petitioner's advances to Savage into the "common stock" form proposed by petitioner. *182 In view of our holding, we shall enter a decision in all material respects similar to the decision originally entered by this Court on December 21, 1967. Footnotes
1. In its original opinion, promulgated March 5, 1969, the Court of Appeals announced that "the judgment of the Tax Court is affirmed, and * * * remanded for further proceedings * * *." On May 5, 1969 the Court of Appeals modified its opinion, stating that the judgment of this Court was "vacated" rather than "affirmed." This was done in order to allow respondent time to consider a petition to the Supreme Court for a writ of certiorari in the taxpayer's appeal to the Court of Appeals and, at the same time, to assure that the judgment of this Court would not become final within the meaning of section 7481(2)(A), I.R.C. 1954↩ if respondent did not petition the Supreme Court for certiorari and thereby put this case beyond this Court's power to take the further action envisioned by the Court of Appeals' mandate.
2. In our original opinion we also decided that petitioner was not subject to the accumulated earnings tax, section 531 et seq., I.R.C. 1954↩.
3. Hereafter all statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
4. A certified copy of the Certificate of Incorporation of Savage was attached to the additional stipulation filed by the parties for the purpose of these proceedings on remand. An amendment to Savage's Certificate of Incorporation was attached to the stipulation. This amendment changed Savage's name from "Savage Construction Company, Inc." to "Savage Construction Company of Bluefield, Inc.", but made no other changes. ↩
5. Hazel S. Haynes is the wife of C. N. Haynes and A. C. Haynes is the brother of C. N. Haynes. J. J. Chase had been a shareholder in Haynes since 1959.↩
6. (While this apparent concession by the respondent also may not have been a foregone conclusion based upon the facts on this record see, in this regard, T.C. Memo. 1967-187, 26 T.C.M. 922↩, 930, par. 67, 187 P-H Memo. T.C., page 1016-67.)
7. The facts and the result in Byerlite Corp. v. Williams, supra↩, also relied upon by petitioner were the same except that six shares of the subsidiary's stock were issued to the taxpayer in return for a payment of $30.
8. SEC. 1504(a). Definition of "Affiliated Group". - As used in this chapter, the term "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if - (1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and (2) The common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations. As used in this subsection, the term "stock" does not include nonvoting stock which is limited and preferred as to dividends.↩